**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

MARIANA PARDO,                                          :

                                          :      Case No.: 2:22-cv-190 (NCM) (ST)

                    Plaintiff,                          :

                                           :

                  v.                                     :

                                           :

TOMAS INFERNUSO DVM, P.C. d/b/a                         :
ANIMAL SURGICAL CENTER, and                            :
TOMAS INFERNUSO in his individual and                  :
professional capacities,                               :

                                           :

                         Defendants.             :
------------------------------------------------------------X

 

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**PARTIAL MOTION TO DISMISS THE AMENDED COMPLAINT AND STAY**
<u>**DISCOVERY**</u>

**WIGDOR LLP**

David E. Gottlieb
Meredith A. Firetog
Brooke Payton (admission pending)

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dgottlieb@wigdorlaw.com
mfiretog@wigdorlaw.com
bpayton@wigdorlaw.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .............................................................................................................................1

I.      Summary of the Material Allegations of the Complaint.......................................................1

II.     Procedural History .............................................................................................................4

ARGUMENT ..................................................................................................................................5

I.      Standard of Review on a Motion to Dismiss .....................................................................5

II.     Dr. Pardo Has Easily Pleaded a NYLL § 740 Claim..........................................................6

        A.    Elements of a Section 740 Pleading.........................................................................6

        B.    Dr. Pardo Alleged Good Faith Complaints About Defendants' Violation of New York Education Law, Article 135........................................................................7

        C.    Dr. Pardo Alleged Good Faith Complaints About Defendants' Violation of NYCRR on Controlled Substances and the Controlled Substances Act..................9

        D.    Plaintiff Alleged Good Faith Complaints Implicating Numerous Other Laws, Rules or Regulations, Many of Which Are Reflected in the Department of Education's Professional Practice Guidelines for Veterinarians ...........................10

        E.    Defendants' Arguments (Or Lack Thereof) That Plaintiff Failed to Plead Violations of Laws, Rules or Regulations Are Completely Incorrect ...................15

        F.    Plaintiff Pleaded Protected Complaints About Violations of Laws Involving a Substantial And Specific Danger to Public Health and Safety ..............................16

III.   Plaintiff Has Easily Pleaded Protected Complaints Regarding Discriminatory Conduct Towards Herself and Other Employee..................................................................................18

IV.   Defendants Are Not Entitled to a Stay Due to a Partial Motion to Dismiss......................23

CONCLUSION..............................................................................................................................26

i

# TABLE OF AUTHORITIES

**Cases**      **Page(s)**

Ashcroft v. Iqbal,
556 U.S. 662 (2009) ............................................................................................ 5, 6

Barnes v. Cnty. of Monroe,
No. 10 Civ. 6164 (JWF), 2013 WL 5298574 (W.D.N.Y. Sept. 19, 2013) ............................... 24

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ............................................................................................... 5

Correa v. Mana Prod., Inc.,
550 F. Supp. 2d 319 (E.D.N.Y. 2008) ............................................................................ 21

Ezuma v. City Univ. of N.Y.,
665 F. Supp. 2d 116 (E.D.N.Y. 2009) ........................................................................... 21

Figueroa v. Johnson,
109 F. Supp.3d 532 (E.D.N.Y. 2015) ............................................................................. 19

Forrest v. Jewish Guild for the Blind,
3 N.Y.3D 295 (2004) ............................................................................................... 22

Gratton v. Jetblue Airways,
No. 04 Civ. 7561 (DLC), 2005 WL 1251786 (S.D.N.Y. May 25, 2005) ................................. 22

HC2 Inc. v. Delaney,,
510 F. Supp. 86 (S.D.N.Y. 2020) ............................................................................... 16

In re Currency Conversion Fee Antitrust Litig.,
No. M21-95, 2002 WL 88278 (S.D.N.Y. Jan. 22, 2002) ................................................... 23

Kanowitz v. Broadridge Fin. Inc.,
No. 13 Civ. 649 (DRH) (AKT), 2014 WL 133870 (E.D.N.Y. Mar. 31, 2014) .......................... 23

Kaytor v. Elec. Boat Corp.,
609 F.3d 537 (2d Cir. 2010) ..................................................................................... 19

Kelly v. Shapiro & Assoc.,
716 F.3d 10 (2d Cir. 2013) ................................................................................... 19, 20

Komorek v. Conflict International, Inc.,
No. 22 Civ. 9467 (ER), 2024 WL 1484249 (S.D.N.Y. March 29, 2024) ................................... 7

Littlejohn v. City of New York,
795 F.3d 297 (2d Cir. 2015) ..............................................................................5, 19, 20, 21

Malena v. Victoria's Secret Direct, LLC,
886 F. Supp. 2d 349 (S.D.N.Y. 2012) ........................................................................... 22

McGrane v. Reader's Digest Ass'n, Inc.,
822 F. Supp. 1044 (S.D.N.Y. 1993) .............................................................................. 16

McKenzie v. Renberg's Inc.,
94 F.3d 1478 (10th Cir. 1996)........................................................................................ 21

Mirra v. Jordan,
No. 15 Civ. 4100 (AT) (KNF), 2016 WL 889559 (S.D.N.Y. Mar. 1, 2016) ........... 23, 24

New York v. Grand River Enterprises Six Nations, Ltd.,
No. 14 Civ. 910 (AF), 2015 WL 686819 (W.D.N.Y. Feb. 18, 2015)............................ 24

Patterson v. City of New York,
No. 158598/2020 (DDR), 2021 WL 5445502 (N.Y. Cnty. Nov. 9, 2021) .................... 22

RBG Mgmt. Corp. v. Village Super Market, Inc.,
No. 22 Civ. 7996 (JLR), 2023 WL 1996920 (S.D.N.Y. Jan. 24, 2023) ....................... 24

Rochelle v. AutoZoners, LLC,
No. 21 Civ. 01220 (PMH), 2023 WL 5935835 (S.D.N.Y. Sept. 12, 2023)................... 19

Sarkis v. Ollie's Bargain Outlet,
No. 10 Civ. 6382 (CJS), 2013 WL 1289411 (W.D.N.Y. Mar. 26, 2013) ..................... 21

Segarra v. Fed. Reserve of New York,
17 F. Supp. 304 (S.D.N.Y 2014) .................................................................................... 16

Tang v. Glocap Search LLC,
No. 14 Civ. 1108 (JMF), 2015 WL 5472929 (S.D.N.Y. Sept. 16, 2015) ..................... 21

Thomas v. New York City Dep't of Educ.,
No. 09 Civ. 5167 (SLT), 2010 WL 3709923 (E.D.N.Y. Sept. 14, 2010) ..................... 24

Tonra v. Kadmon Holdings, Inc.,
405 F. Supp. 3d 576 (S.D.N.Y 2019) ............................................................................. 16

O'Sullivan v. Deutsche Bank AG,
No. 17 Civ. 8709 (LTS) (GWG), 2018 WL 1989585 (S.D.N.Y. Apr. 26, 2018).............. 23, 24

Ugactz v. United Parcel Serv., Inc.,
No. 10 Civ. 1247 (MKB), 2013 WL 1232355 (E.D.N.Y. Mar. 26, 2013) ................................. 20

Webb-Weber v. Community Action for Human Services, Inc.,
23 N.Y.3d 448 (2014) ................................................................................................ 6, 7, 10

Vo v. Goodwill Indus. of Bronx Site,
No. 04 Civ. 5039 (MHD), 2009 WL 5179136 (S.D.N.Y. Dec. 29, 2009) ................................. 22

Zhang v. Centene Mgmt. Co.,
No. 21 Civ. 5313 (DG) (CLP), 2023 WL 2969309 (E.D.N.Y. Feb. 2, 2023) ........................... 15

Statutes

12 U.S.C. § 1831j ...................................................................................................... 16

N.Y. Ed. Law § 6705 ................................................................................................... 8

N.Y. Ed. Law § 6700 ................................................................................................... 7

N.Y. Ed. Law § 6702 ................................................................................................... 12

N.Y. Ed. Law § 6711 ................................................................................................ 7, 15

N.Y. Ed. Law § 6715 ................................................................................................... 12

N.Y. Pub. Health Law § 3304 ...................................................................................... 7

New York Labor Law § 740 ..................................................................................... 1, 6, 7

Rules

Fed. R. Civ. P. 72 ........................................................................................................ 5

8 NYCRR § 29.1 ..................................................................................................... 11, 12

8 NYCRR § 29.6 .................................................................................................. 12, 13, 14

10 NYCRR § 80.48 ......................................................................................... 7, 9, 13, 14, 15

**PRELIMINARY STATEMENT**

Defendants' partial motion to dismiss is more notable for what it ignores than what it actually addresses. Defendants argue that Plaintiff failed to assert a whistleblower claim under New York Labor Law §740 ("Section 740") because she did not allege violations of any law, rule or regulation—but Defendants ignore that there is absolutely no obligation to do so at the pleading stage. Defendants also ignore specific laws that Plaintiff did, in fact, identify in her Amended Complaint. Defendants argue that Plaintiff's complaints about Defendants' violations of the Professional Practice Guidelines for Veterinarians cannot qualify as a law, rule or regulation under Section 740—but Defendants ignore that those Veterinary Practice Guidelines are expressly derived and compiled from other laws. Defendants ignore that Plaintiff's other retaliation claims—under the anti-discrimination laws—are based on Plaintiff's opposition to mistreatment of an employee with a serious medical condition and participation in his objections. Defendants further ignore that Plaintiff engaged in protected activity when she opposed Defendants' harassment of her with excessive working hours after she disclosed her pregnancy and sought pregnancy-related accommodations. In the end, Defendants' motion is clearly nothing more than an attempt to mischaracterize the allegations of the Amended Complaint and misstate the law in a futile effort to obtain an unwarranted stay of discovery.

**BACKGROUND**

**I.     Summary of the Material Allegations of the Complaint**

Dr. Pardo is an experienced and accomplished veterinarian. See Dkt. No. 19 at ¶¶ 24-26. In 2021, Dr. Tomas Infernuso began recruiting Dr. Pardo to join Animal Surgical Center ("ASC") to develop an Emergency Room ("ER"). Id. at ¶¶ 27-35. Dr. Pardo started working at ASC in September 2022. Id. at ¶ 36.

1

From the outset of her employment, Dr. Pardo witnessed a litany of problematic practices at ASC—many of which constituted unlawful and unethical veterinary practices and others which included an array of mistreatment of employees. With respect to unlawful and unethical veterinary practices, Dr. Pardo observed the following:

- In violation of New York Education Law Article 135, unlicensed non-credentialed assistants who had not completed the requisite schooling were performing work that could only be done by Licensed Eligible Veterinary Technicians ("LEVT"), such as monitoring anesthesia, performing venipuncture and administering intravenous medication. Id. at ¶¶ 49-59; 74.

- In violation of New York State law, ACS was permitting the improper administration of controlled substances, including the improper use and record keeping with respect to the administration of fentanyl and other controlled substance medication. Id. at ¶¶ 60-64; 74.

- In violation of New York State Professional Practice Guidelines for Veterinarians, numerous instances of egregious incompetence and substandard care, including but not limited to, engaging in incompetence in the practice of veterinary medicine, administering excessive and cruel treatment to animals, failing to provide patients with appropriate medical instructions upon discharge, failure to maintain proper medical records and failure to properly dispose of hypodermic needles. Id. at ¶¶ 65-75.

Dr. Pardo raised several complaints and concerns to ASC and Dr. Infernuso about this unlawful conduct and the need to correct it. Id. at ¶¶ 46, 53-56, 59-60, 62, 64-65, 68 and 70-75. Dr. Infernuso refused to change or correct ASC's unlawful conduct and he subjected Dr. Pardo to harassment, hostility and animus for repeatedly raising these complaints and refused to finalize her employment contract. Id. at ¶¶ 76-81, 84-89.

In addition to ASC's unlawful treatment of its veterinary patients, Dr. Pardo also observed Dr. Infernuso's horrible treatment of ASC's employees. Dr. Pardo raised complaints on behalf of her colleagues and also advocated for herself when she was subjected to

2

mistreatment.  Id. at ¶¶ 82-103, 108-20.  While there are several examples of Dr. Infernuso's treatment of employees, relevant here are two particular examples which follow.[1]

First, Dr. Pardo supported and advocated for non-discriminatory treatment of an employee referred to in the Amended Complaint as Employee B.  Employee B reported to Dr. Pardo that Dr. Infernuso had "made insensitive and discriminatory comments about his body and posture."  Id. at ¶ 97.  The comments at issue offended Employee B because the condition of his body and posture was the result of "a serious accident" and which caused him "severe depression and resulted in suicidal ideation."  Id. at ¶ 98.  In support of Employee B, Dr. Pardo scheduled a meeting in which Dr. Infernuso apologized and agreed to refrain from making such comments in the future.  Id. at ¶¶ 99-100.  Dr. Infernuso later reprimanded Dr. Pardo for "rais[ing] complaints about his treatment of employees."  Id. at ¶¶ 101-02.

Second, Dr. Pardo raised complaints about the way Dr. Infernuso was harassing her following her disclosure of her pregnancy and request for workload accommodations.  Id. at ¶¶ 108-20.  Specifically, on or about April 6, 2023, Dr. Pardo informed Dr. Infernuso that she was pregnant.  Id. at ¶ 108.  Dr. Infernuso amplified his mistreatment of her rather than accommodate an employee who would need reasonable accommodations and maternity leave.  Id. at ¶ 110.  Almost immediately, Dr. Infernuso began questioning her commitment to ASC and suggested that she was not devoting sufficient time or energy to her position.  Id. at ¶ 111.  Dr. Infernuso insisted that Dr. Pardo increase her workload—knowing that Dr. Pardo would need reasonable accommodations to attend doctor's appointments and care for herself during this time.  Id. at ¶¶

---

[1]  Though not germane to the present motion, Dr. Pardo observed other forms of mistreatment which do not necessarily implicate the anti-discrimination laws.  As examples, Dr. Pardo advocated for employees to be compensated for time that otherwise would have not been compensated when they attended a firm holiday party and spoke up for a colleague who had been harassed by Dr. Infernuso with inappropriate language regarding a pet's death under ASC's care.  See Dkt. No. 19 at ¶¶ 83, 90-96.

112-13. Dr. Pardo opposed Dr. Infernuso's demands. Id. at ¶ 114. Dr. Pardo then started suffering from stress and anxiety, and even physical manifestations, including blood spotting—a terrifying circumstance for a pregnant woman. Id. at ¶ 115. Dr. Pardo reported her concerns to Human Resources and complained that the hours demanded were not feasible given her existing workload and pregnancy. Id. at ¶ 120. Despite her complaints, Dr. Infernuso did not relent. Id.

Dr. Infernuso exhibited retaliatory animus towards Dr. Pardo in response to all of her protected conduct, including her complaints about unlawful and unethical veterinary practices, discriminatory treatment of employees and discriminatory treatment of her following her pregnancy disclosure. Id. at ¶¶ 47-48, 76-81, 84-85, 96, 101-02. On May 5, 2023, in a culmination of Dr. Infernuso's retaliatory animus, he fired Dr. Pardo. Id. at ¶ 121. In her termination meeting, Dr. Infernuso confirmed that her termination had "nothing to do with performance." Id. at ¶¶ 122-24. Immediately after this conversation, Dr. Pardo pressed Mr. Welsh for the reasons for termination, and he reiterated that it had "[n]othing to do with your skill or your abilities or your performance particularly, but he [Dr. Infernuso] feels that you and him have very different opinions and views on how to handle things." Id. at ¶ 125.

## II.    **Procedural History**

On January 10, 2024, Dr. Pardo commenced this action by filing a Summons and Complaint. See Dkt. No. 1. On February 13, 2024, Defendants filed a pre-motion conference letter seeking leave to file a partial motion to dismiss and stay discovery, which Plaintiff opposed. See Dkt. Nos. 14, 15. On February 21, 2024, the Court denied the request and ordered the parties to first proceed with an initial conference before Magistrate Judge Steven Tiscione. See Dkt. Txt dated Feb. 21, 2024.

On February 23, 2024, an initial conference was held by Judge Tiscione, before which the parties submitted a proposed discovery plan worksheet. See Dkt. Nos. 16, 17. Judge Tiscione denied Defendants' request for a stay of discovery given that Defendants had only stated an intention to file a partial motion to dismiss, though stated that Defendants could try to ask for one from the District Court Judge. See Gottlieb Decl.[2] at Ex. A at 4:12-16 ("My inclination is never to stay discovery when there's a pending partial Motion [] to Dismiss. It's really only -- you know, if it's a fully dispositive motion, then that might bear -- you know, merit some discussion. But unless it's fully dispositive, my inclination is not to stay discovery.").[3]

On May 13, 2024, Defendants served this partial motion to dismiss. Despite Judge Tiscione having already denied their request for a stay of discovery—from which Defendants never sought reconsideration from nor filed a Fed. R. Civ. P. 72 objection—Defendants also seek a stay of discovery. Respectfully, for the reasons stated herein, both requests should be denied.

## ARGUMENT

### I. Standard of Review on a Motion to Dismiss

On a motion to dismiss for failure to state a claim, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." Littlejohn v. City of New York, 795 F.3d 297, 307 (2d Cir. 2015). The complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows

---

[2]   Hereinafter, all references to "Ex. __" are references to exhibits to the Gottlieb Decl.
[3]   On March 11, 2024, Plaintiff filed an Amended Complaint and the parties then effectively re-filed the same pre-motion letters regarding Defendants' proposed partial motion to dismiss. See Dkt. Nos. 19, 10, 21.

a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

## II.     Dr. Pardo Has Easily Pleaded a NYLL § 740 Claim

### A.     Elements of a Section 740 Pleading

New York Labor Law § 740, which was amended and substantially broadened in 2021 (effective in 2022), prohibits employers taking retaliatory action against an employee who "discloses . . . to a supervisor . . . an activity, policy or practice of the employer that [1] the employee ***reasonably believes*** is in violation of a law, rule, or regulation ***or*** [2] that the employee ***reasonable believes*** poses a substantial and specific danger to the public health or safety." NYLL § 740(2)(a) (internal brackets and emphasis added).[4]

Even under the previous, narrower version of Section 740, a plaintiff had no obligation to plead with specificity any actual law, rule or regulation was violated.  See e.g. Webb-Weber v. Community Action for Human Services, Inc., 23 N.Y.3d 448, 452 (2014) ("The plain language of Labor Law § 740(2)(a) does not impose any requirement that a plaintiff identify the specific law, rule or regulation violated as part of a section 740 claim . . . Just as an employee need not cite the actual law, rule or regulation violated when the complaint is made, her pleading is,

---

[4]     The previous version of Section 740, enacted in 1984, had for years been criticized for its lack of protection provided to whistleblowers.  It only protected whistleblowers who raised complaints about an actual violation of a law, rule or regulation—mere "reasonable belief" did not suffice—and it only applied to such violations that implicated "substantial danger to public health or safety."  Following a five-year study by the New York State Law Revision Commission, State legislators determined that amendments were necessary because:

> New York State should encourage, not discourage, employees who wish to report violations of law by their employers. Although the "Whistleblower Law" enacted in 1984 was a good first step, experience over the past 20 years has shown that the law is simply inadequate. By making the necessary reforms to strengthen the law, this bill will act as a deterrent to employers who might otherwise engage in illegal activity, will protect the public from such wrongdoing, and will ensure that the honest and law-abiding employees who have the courage to reveal illegal activities are protected against retaliation by their employers.

See Ex. B (Mem. in Support of A05696, N.Y. State Assembly).

corresponding, not required to identify the law, rule or regulation violated.") (internal quotations and citations omitted). However, under the amended law, which does not even require a law, rule or regulation to have been violated—simply that there was a reasonable belief—it is even clearer that a plaintiff has no such pleading obligation. See e.g. Komorek v. Conflict International, Inc., No. 22 Civ. 9467 (ER), 2024 WL 1484249, at *6 (S.D.N.Y. March 29, 2024) (applying this holding from Webb-Weber after NYLL § 740 was amended). In sum, at the pleading stage, a Section 740 plaintiff simply needs to plausibly allege that she reasonably believed her employer had violated a law rule or regulation.

Notwithstanding Section 740's pleading standard, Dr. Pardo has gone far above-and-beyond by identifying several laws, rules and/or regulations she reasonably believes were violated, including (1) N.Y. Educ. Law § 6700 et seq.; (2) N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 10, § 80.48; and (3) N.Y. Pub. Health Law § 3304 ("Controlled Substances Act"). Moreover, Dr. Pardo has alleged that she reasonably believed Defendants violated the Professional Practice Guidelines for Veterinarians promulgated by the New York State Education Department ("Veterinary Practice Guidelines")—which are derived from and based on statutory law as described below—and that those violations constituted unlawful conduct.

**B.    Dr. Pardo Alleged Good Faith Complaints About Defendants' Violation of New York Education Law, Article 135**

Dr. Pardo alleges that she raised complaints about ASC's unlawful use of unlicensed veterinary technicians to perform work that could only be done by Licensed Veterinary Technicians ("LVT") or License-Eligible Veterinary Technicians, as required by N.Y. Educ. Law § 6700 et seq.[5] See Dkt. No. 19 at ¶¶ 49-59.

---

[5]    Licensed Veterinary Technicians have completed the required schooling and passed a licensing exam, while License-Eligible Veterinary Technicians have completed the required schooling but have not yet sat for a licensing exam. See N.Y. Educ. Law § 6711-a.

Under N.Y. Ed. Law, Art. 135 § 6711, individuals may only be licensed to practice as a veterinary technician if they have "successfully completed a four-year course of study[,] hold a diploma from a school of veterinary science technology for the training of animal health technicians, [have passed] an examination satisfactory to the board, [and are] of good moral character." Otherwise, under N.Y. Ed. Law §§ 6705(5)-(12), all other veterinary staff—including interns, residents, students, dentists and college faculty—must perform their work under the "supervision of a licensed veterinarian."

Dr. Pardo alleges in her Amended Complaint that she frequently witnessed and reported violations of these laws at ASC. Dr. Pardo alleges that "on multiple occasions, patients were not provided with scheduled medications because a staff member without a medical license to practice veterinary care determined the pet did not need the medication." See Dkt. No. 19 at ¶ 74. Dr. Pardo alleges that one patient in the ICU "was given two times the proper dose of medication in a pump that was set up by an assistant" without the proper training or licensure to perform such a task. Id. at ¶ 74. Dr. Pardo further alleges that she found out that highly dangerous controlled substances, like fentanyl, were "being administered by non-licensed staff members[.]" Id. at ¶ 63. Dr. Pardo alleges that she was informed that "veterinary surgeons were allowing assistants to administer intravenous injections. Specifically, a [LVT] reported to Dr. Pardo that the assistant was often tasked with dosing medication in a syringe and inserting the medication into the intravenous catheter." Id. at ¶ 55. These are all mere examples.

Dr. Pardo alleges that she believed the practice of allowing non-licensed staff to perform such tasks to be unlawful, and that she repeatedly raised complaints about the practice and its legality to Dr. Infernuso. For instance, Dr. Pardo alleges that she sent an email to Dr. Infernuso detailing the unlawfulness and dangers of such practices: ". . .we have been using these staff

members in illegal ways . . . a patient was overdosed because the person doing anesthesia is not licensed . . . License eligible techs need to be supervised . . ." Id. at ¶ 54. Dr. Pardo reported to Dr. Infernuso that this conduct was "a genuine liability for the company and a danger to the patients." Id. at ¶¶ 56, 64. Dr. Pardo alleges that she was retaliated against for raising these complaints, ultimately leading to her termination. Id. at ¶¶ 76-81, 84-89.

These plausible allegations are more than sufficient at the pleading stage.

### C. Dr. Pardo Alleged Good Faith Complaints About Defendants' Violation of NYCRR on Controlled Substances and the Controlled Substances Act

Dr. Pardo alleges that she raised complaints of improper administration of highly dangerous controlled substances at ASC, in violation of 10 NYCRR 80.48(3)(ii) and the Controlled Substances Act, § 3322 et seq. Id. at ¶¶ 60-64.

Under 10 NYCRR §80.48(3)(ii), facilities[6] must maintain records of "the date and hour of administration, the name of the patient, the name of the prescribing practitioner, the quantity of administration, the balance on hand after each administration and the signature of the administering nurse." Facilities must also keep a record in each patient's chart "indicating administration of the controlled substance, including the name of the administering attendant and the date and hour of administration." Id. at §80.48(3)(ii). Furthermore, under the Controlled Substances Act, § 3322, licensed individuals must "maintain records of all controlled substances manufactured, compounded, received, disposed of, delivered or distributed by them."

In her Amended Complaint, Dr. Pardo alleges that ASC was non-compliant with these administration and record-keeping requirements and that she raised these unlawful issues with

---

[6] As defined under the law, "facilities" include "veterinary hospitals [that have] obtain[ed] a Class 3 license from the Department [of Health] and thereafter a registration from the Drug Enforcement Agency, United States Department of Justice, or its successor agency." Id. at §80.46(a). As an entity licensed to dispense controlled substances, ASC is subject to these legal requirements.

Dr. Infernuso. For example, Dr. Pardo alleges that a medication was erroneously administered to a patient without dilution in contravention of the necessary protocols for the patient, and that the patient's medical record therefore did not adequately reflect usage and administration of the controlled substance. See Dkt. No. 19 at ¶ 74. As another example, Plaintiff alleges that ASC staff would administer fentanyl to patients as part of a constant rate infusion and not as part of a separate bolus of medication, and that doing so did not allow for accurate dosing, leading to inaccurate record keeping. Id. at ¶ 62. As yet another, Dr. Pardo alleges that a patient being administered fentanyl was found with an empty syringe, but because monitoring did not take place over several hours, it was unclear how long the syringe had been empty. Id. at ¶ 74.

As with the section above, Dr. Pardo alleges that she was retaliated against for raising these complaints, ultimately leading to her termination. Id. at ¶¶ 76-81, 84-89. These allegations are more than sufficient.

**D.      Plaintiff Alleged Good Faith Complaints Implicating Numerous Other Laws, Rules or Regulations, Many of Which Are Reflected in the Department of Education's Professional Practice Guidelines for Veterinarians**

Dr. Pardo further alleges that she raised numerous complaints regarding ASC's violations of numerous strictures of the Veterinary Practice Guidelines. While Defendants argue that the Veterinary Practice Guidelines do not constitute "laws, rules or regulations" under Section 740, this argument misses the mark. As mentioned above, a Section 740 plaintiff need not even identify any specific law, rule or regulation in order to state a claim, so long as the plaintiff's belief was reasonable. See supra at II(A) (citing e.g. Webb-Weber, 23 N.Y.3d at 452).

Notwithstanding the irrelevance of this argument, Defendants' attempt to minimize the import of the Veterinary Practice Guidelines is completely off base. Defendants know very well that the Veterinary Practice Guidelines are derived directly from laws, rules and regulations. See

10

e.g. Ex. C at p. 25 (explaining that the purpose of the Veterinary Practice Guidelines is to "provide guidance regarding the implementation of the Rules of the New York State Board of Regents" and they were "developed by the Professional State Boards of New York . . . in accordance with New York Education Law, Title VIII, § 6504 . . . [to] . . .assist licensed professionals in understanding how to apply the law and accompanying rules and regulations in their daily practice."). Put another way, violations of the Veterinary Practice Guidelines will usually constitute a violation of a foundational law on which they are based.

In her Amended Complaint, Dr. Pardo alleges numerous alarming practices at ASC (in addition to the items mentioned above, see supra at §§ II(B)-(C), Dr. Pardo set forth an extensive list of improper veterinary care at Paragraph 74 of the Amended Complaint), her reasonable belief that those practices violated the Veterinary Practice Guidelines, and that she raised complaints about these violations to Dr. Infernuso. See Dkt. No. 19 at ¶ 74. The following chart reflects numerous alleged violations set forth in Paragraph 74 of the Amended Complaint and laws, rules and regulations to which those violations correlate.

| Allegation from ¶ 74 of the Amended Complaint | Examples of Correlating Laws, Rules or Regulations |
|---|---|
| "The surgery team performed CPR incorrectly, failed to follow post-CPR guidelines, and did not have back-up carbon dioxide or the crash cart readily available during CPR." | *8 NYCRR § 29.1(b)(9)*: prohibiting licensed, certified and registered veterinary professionals from performing professional responsibilities that she/her knows he/she is not competent to perform. |
| "On multiple occasions, patients were not provided with scheduled medications because a staff member without a medical license to practice veterinary care determined | *8 NYCRR § 29.1(b)(9)*: prohibiting licensed, certified and registered veterinary professionals from performing professional responsibilities that she/her knows he/she is not competent to perform; *8 NYCRR § 29.1(b)(10)*: prohibiting licensed, certified and registered veterinary professionals from delegating responsibilities to individuals whom the professional knows or has reason to know is not qualified to perform the task; *8 NYCRR § 29. 6(a)(11)(ii)*: prohibiting veterinarians at multi- |

11

| | |
|---|---|
| the pet did not need the medication." | veterinary practices from failing to adequately supervise the licensed and unlicensed personnel in their practice who are assigned to care for their patients; *8 NYCRR § 29.6(a)(2)*: prohibiting a veterinary practitioner from failing to adequately supervise an individual who is only authorized to practice under their supervision; *N.Y. Educ. Law § 6702(1)*: providing that only a person licensed or exempt from needing a license shall practice veterinary medicine. |
| "A patient was placed in an oxygen cage, but the oxygen pump was not turned on." | *8 NYCRR § 29.1(b)(9)*: prohibiting licensed, certified and registered veterinary professionals from performing professional responsibilities that she/her knows he/she is not competent to perform. |
| "A blood pressure medication was provided undiluted, resulting in a ten-times overdose, which created extreme risk for arrhythmia and other complications." | *8 NYCRR § 29.6(a)(7)*: prohibiting excessively administering a treatment; *8 NYCRR § 29.1(b)(9)*: prohibiting licensed, certified and registered veterinary professionals from performing professional responsibilities that she/her knows he/she is not competent to perform. |
| "A cat with highly contagious feline immunodeficiency virus ("FIV") was housed with other cats exposing the other patients to this terrible illness." | *8 NYCRR § 29.6(a)(11)(ii)*: prohibiting veterinarians at multi-veterinary practices from failing to adequately supervise the licensed and unlicensed personnel in their practice who are assigned to care for their patients. |
| "A patient in the ICU was given two times the dose of medication in a pump that was set up by an assistant." | *8 NYCRR § 29.1(b)(9)*: prohibiting licensed, certified and registered veterinary professionals from performing professional responsibilities that she/her knows he/she is not competent to perform; *8 NYCRR § 29.1(b)(10)*: prohibiting licensed, certified and registered veterinary professionals from delegating responsibilities to individuals whom the professional knows or has reason to know is not qualified to perform the task; *8 NYCRR § 29.6(a)(2)*: prohibiting a veterinary practitioner from failing to adequately supervise an individual who is only authorized to practice under their supervision; *8 NYCRR § 29.6(a)(7)*: prohibiting excessively administering a treatment. |
| "A patient was discharged with medical instructions, but the staff could not find the medications and did not provide all medications to the pet's owner upon discharge." | *N.Y. Educ. Law § 6715*: requiring that a veterinarian who prescribes a new drug to a patient for use outside the office provides the patient's owner with the name and description of the drug, directions for its use and information about its adverse effects. |

| | |
|---|---|
| "A patient on a continuous rate of fentanyl was found with an empty syringe, but because monitoring did not take place over several hours, it was unclear how long the syringe had been empty." | *8 NYCRR § 29.6(a)(7)*: prohibiting excessively administering a treatment or using treatment facilities that are not warranted by the animal patient's condition; *8 NYCRR § 29.6(a)(11)(i)*: prohibiting veterinarians at multi-veterinary practices from failing to clearly identify in a patient's record the treating veterinarian and veterinary technician who provided patient care for each visit; *10 NYCRR § 80.48*: requiring "a record in the patient's chart indicating administration of the controlled substance," including the name of the administering attendant and the date and hour of administration. |
| "Three separate patients' bills had substantial errors on them, including overcharges, charges for services that were not completed, and listing the wrong doctors as overseeing the patients." | *8 NYCRR § 29.6(a)(3)*: prohibiting a failure to adequately record all visits, diagnoses and prescribed treatments for a patient for at least three years. |
| "During rounds, a doctor stated that stray cats should not receive an examination and should be euthanized instead." | *8 NYCRR § 29.6(b)(5)*: prohibiting licensed, certified and registered veterinary professionals from evidencing a moral unfitness to practice veterinary medicine; *8 NYCRR § 29.6(a)(7)*: prohibiting excessively administering a treatment or using treatment facilities that are not warranted by the animal patient's condition. |
| "A fentanyl syringe pump had died, but instead of noting the low battery, the syringe had been unplugged and plugged into another animal's pump." | *8 NYCRR § 29.6(b)(5)*: prohibiting licensed, certified and registered veterinary professionals from evidencing a moral unfitness to practice veterinary medicine. |
| "A patient was discharged with a post-surgical drain and the owners were not provided any discharge instructions on how to manage the drain at home." | *8 NYCRR § 29.6(a)(9)*: prohibiting abandoning a patient who is under immediate care without reasonably arranging for the continuity of such care. |
| "A veterinary technician misread a label and administered the incorrect drug." | *8 NYCRR § 29.6(a)(2)*: prohibiting a veterinary practitioner from failing to adequately supervise an individual who is only authorized to practice under their supervision; *8 NYCRR § 29.6(a)(11)(ii)*: prohibiting veterinarians at multi-veterinary practices from failing to adequately supervise licensed and unlicensed personnel in their practice who are assigned to care for their patient; *8 NYCRR § 29.6(a)(7)*: prohibiting excessively administering a treatment or using treatment facilities that are not warranted by the animal patient's condition. |

| | |
|---|---|
| "An anti-nausea medication was not given because an assistant determined it was not needed." | *8 NYCRR § 29.6(a)(2)*: prohibiting a veterinary practitioner from failing to adequately supervise an individual who is only authorized to practice under their supervision; *8 NYCRR § 29.6(a)(11)(ii)*: prohibiting veterinarians at multi-veterinary practices from failing to adequately supervise licensed and unlicensed personnel in their practice who are assigned to care for their patient. |
| "A medication was administered without dilution, and the medical record did not adequately reflect the protocol for injecting the medication." | *8 NYCRR § 29.6(a)(3)*: prohibiting a failure to adequately record all visits, diagnoses and prescribed treatments for a patient for at least three years; *8 NYCRR § 29.6(a)(7)*: prohibiting excessively administering a treatment or using treatment facilities that are not warranted by the animal patient's condition; *10 NYCRR § 80.48*: requiring "a record in the patient's chart indicating administration of the controlled substance." |
| "Staff found medical needles disposed of in the garbage instead of in the proper receptacles." | *9 NYCRR § 4120.19*: requiring that hypodermic needles be used once and disposed of properly, both of which are overseen by the practicing veterinarian or veterinary technician. |
| "A remedy to heal wounds and stop bleeding was given to a patient overnight, but no document or staff documented that treatment." | *8 NYCRR § 29.6(a)(3)*: prohibiting a failure to adequately record all visits, diagnoses and prescribed treatments for a patient for at least three years. |

The above chart sets forth laws, rules and regulations which were arguably violated in connection with Dr. Pardo's whistleblower complaints. Thus, even if the Veterinary Practice Guidelines are not "laws, rules or regulations," that argument is irrelevant *not only* because a plaintiff need not plead the laws at issue which have been violated, *but also because* the conduct at issue clearly does reasonably implicate numerous laws, rules and regulations.

As with the sections above, Dr. Pardo alleges that she was retaliated against for raising these complaints, ultimately leading to her termination. See Dkt. No. 19 at ¶¶ 76-81, 84-89. As with the preceding section, these allegations are more than sufficient.

**E.      Defendants' Arguments (Or Lack Thereof) That Plaintiff Failed to Plead Violations of Laws, Rules or Regulations Are Completely Incorrect**

Given the above, and the overwhelmingly ample and plausible allegations of the Amended Complaint, Defendants proverbially "reach for straws" in arguing that Dr. Pardo's allegations are insufficient for not identifying violated laws, rules or regulations—which is not even a pleading requirement in the first place.

First, to address Plaintiff's allegation that ACS violated N.Y. Educ. Law § 6711 *et seq.* by permitting unlicensed persons to perform veterinary medicine, Defendants *fully ignore and do not even address those allegations.* Defendants cannot get a claim dismissed by "burying their head in the sand" and pretending as if those allegations do not exist. Defendants' failure to address those allegations is, alone, fatal to their motion.

Second, as to Plaintiff's allegations that Dr. Pardo raised complains about the improper record keeping around controlled substances in violation of 10 NYCRR § 80.48 and the Controlled Substances Act, Defendants falsely argue that Dr. Pardo did allege improper record keeping and instead only alleged administration of the drug. See Defs.' Br. at pp. 13-14. As explained, whether Defendants' conduct actually violated the law is irrelevant, as all that matters is whether Dr. Pardo had a reasonable belief. However, as set forth above, the conduct Dr. Pardo complained about did, in fact, implicate record keeping with regard to controlled substances. See supra at § II(C). Defendants completely misplaced any reliance on Zhang v. Centene Mgmt. Co., No. 21 Civ. 5313 (DG) (CLP), 2023 WL 2969309, at * 17 (E.D.N.Y. Feb. 2, 2023) (finding, under the pre-amended Section 740, plaintiff did not plead conduct that violated a "law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety" by pleading complaints about a reduction in employee hours").

Third, for the reasons set forth above, Defendants' argument that Plaintiff's references to Dr. Infernuso's violations of the Veterinary Practice Guidelines fail to state a claim misses the point. See supra at § II(D). Defendants' cited cases for that proposition are irrelevant to any issue in this litigation. See e.g. McGrane v. Reader's Digest Ass'n, Inc., 822 F. Supp. 1044, 1050 (S.D.N.Y. 1993) (simply stating the general proposition that professional guidelines—in that case, an internal code of conduct at a private company, Reader's Digest—do not constitute a law, rule or regulation under Section 740); Segarra v. Fed. Reserve of New York, 17 F. Supp. 304, 307 (S.D.N.Y 2014) (determining that an advisory letter published by the Federal Reserve's Board of Governor's Division of Bank Supervision and Regulation did not constitute a "law or regulation" for purposes of 12 U.S.C. § 1831j); HC2, Inc. v. Delaney, 510 F. Supp. 86, 97-98 (S.D.N.Y. 2020) (dismissing complaint under pre-amended Section 740—where reasonable belief was insufficient—where the plaintiff complained about COVID-19 practices of his employer that had not yet been prohibited by any law, rule or regulation); Tonra v. Kadmon Holdings, Inc., 405 F.Supp.3d 576, 587 (S.D.N.Y 2019) (failure to state Section 740 claim where plaintiff's own emails showed that he did not have a reasonable belief that conduct at issue was illegal).

F.     **Plaintiff Pleaded Protected Complaints About Violations of Laws Involving a Substantial and Specific Danger to Public Health and Safety**

Defendants' lead argument for dismissal of Plaintiff's Section 740 claim is an argument Defendants knew very well was not even Plaintiff's primary theory of her case. As mentioned above, under the previous iteration of Section 740, complaints were only protected from retaliation if they implicated a violation of a law, rule or regulation involving public health and safety. Under the amended law, a protected complaint can involve any conduct that constitutes any violation of a law, rule or regulation. However, the new statute *also* covers conduct that the employees "reasonable believes poses a substantial and specific danger to the public health or

16

safety," *whether that conduct constitutes a violation of a law, rule or regulation or not*. Respectfully, even on this prong of Section 740, Dr. Pardo has sufficiently pleaded a claim.

Dr. Pardo has alleged that she raised complaints about ASC being negligent and reckless with respect to the administration of controlled substances, including pain medication and opioids such as fentanyl. See Dkt. No. 19 at ¶¶ 60-64. These are serious matters that Defendants effectively argue are "no big deal." Opioids, and fentanyl in particular, are highly dangerous and addictive controlled substances that have led to numerous public health concerns.[7] According to the U.S. Drug Enforcement Agency ("DEA"), "Fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent . . . [and] because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction."[8] According to the National Institute on Drug Abuse, "[d]eaths involving synthetic opioids other than methadone (primarily fentanyl) continued to rise with 73,838 overdose deaths reported in 2022."[9] The New York City Department of Health states that "fentanyl is now the most common drug involved in overdose deaths."[10] Thus, there is no question that the unlawful use of opioids—which is largely driven by fentanyl—is a "public health crisis" in New York State.[11] Moreover, because of its use

---

[7] Just days ago, it was reported that a 19-year-old college freshman in New York died when taking what she believed to be a single Percocet pill that turned out to be fentanyl. See Ex. D (Patrick Reilly, *NY College Freshman, 19, Dies After Taking Just One Percocet – Which Was Really Fentanyl*, NEW YORK POST (June 11, 2024), https://nypost.com/2024/06/11/us-news/ny-teen-dies-of-fentanyl-overdose-after-taking-just-one-fake-percocet).

[8] See Ex. E (*Facts About Fentanyl*, U.S. DRUG ENFORCEMENT ADMIN., https://www.dea.gov/resources/facts-about-fentanyl (last visited June 11, 2024)).

[9] See Ex. F (*Drug Overdose Death Rates*, NAT'L INST. ON DRUG ABUSE (May 11, 2024), https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates).

[10] See Ex. G (*Fentanyl*, NYC HEALTH, https://www.nyc.gov/site/doh/health/health-topics/fentanyl.page (last visited June 11, 2024)).

[11] See Ex. H (*Opioid-Related Data in New York State*, N.Y. DEPT. OF HEALTH (December 2023), https://www.health.ny.gov/statistics/opioid/).

in the illegal drug trade, there have been numerous reports of individuals stealing fentanyl from medical facilities across the country.[12]

For all these reasons, the proper administration of these opioids is critical to containing this public health crisis, the number of overdoses and deaths and the harm done to the public. In this context, Dr. Pardo's allegations regarding complaints about ASC negligently and recklessly using, tracking and keeping records of fentanyl and other controlled substances plausibly pleads her reasonable belief that she was raising concerns that ASC's practice "pose[d] a substantial and specific danger to the public health or safety."

## III. Plaintiff Has Easily Pleaded Protected Complaints Regarding Discriminatory Conduct Towards Herself and Other Employee

Dr. Pardo alleges two forms of protected activity from which her retaliation claims are predicated. First, Dr. Pardo alleged that she supported a colleague and raised concerns about discrimination towards him on the basis of his disability. Second, Dr. Pardo alleges that she opposed Dr. Infernuso's harassment of her and failure to respect and accommodate her pregnancy-related conditions. Plaintiff made it crystal clear that these were her arguments in her opposition to Defendants' pre-motion letter. See e.g. Dkt. No. 15 ("Dr. Pardo's NYSHRL retaliation claims are predicated on her opposing discrimination and harassment towards others and opposing harassment of her following her pregnancy"). Nonetheless, Defendants attempt in vain to obfuscate the issue by largely pointing to other allegations.

Under both Title VII and the NYSHRL, to plead a retaliation claim, a plaintiff need only alleged establish: "(1) that she participated in an activity protected by Title VII [or the NYSHRL], (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal

---

[12]     See Ex. I (collecting articles).

18

connection between the protected activity and the adverse employment action." Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010). Defendants argue only that Plaintiff failed to adequately plead prong (1).

Protected activity is defined as any "action taken to protest or oppose statutorily prohibited discrimination." Figueroa v. Johnson, 109 F.Supp.3d 532, 549 (E.D.N.Y. 2015). This can include opposition to discriminatory conduct towards others. See e.g. Littlejohn v. City of New York, 795 F.3d 297, 318 (2d Cir. 2015) ("[I]f an employee . . . actively supports other employees in asserting their Title VII rights or personally complains or is critical about the discriminatory employment practices of her employer, that employee has engaged in a protected activity[.]"). Notably, a "plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as [she] can establish that [she] possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." Kelly v. Shapiro & Assoc., 716 F.3d 10, 16 (2d Cir. 2013).

Here, Dr. Pardo alleged that she supported, and advocated for, an employee who was being discriminated against due to his disabilities and participated in his protected activity. Under NYSHRL, a disability is defined to include any "physical, mental or medical impairment resulting from anatomical [or] physiological [] conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." NYSHRL § 292.21. As alleged in the Amended Complaint, Dr. Pardo attempted to advocate for an employee with a medical condition from a serious accident that led to differences in his "appearance" and his "gait" and led to "depression" and "suicidal ideation." See Dkt. No. 19 at ¶ 98. Clearly, these conditions either constitute a disability or a perceived disability under NYSHRL at the pleading stage. See e.g. Rochelle v. AutoZoners, LLC, No. 21

19

Civ. 01220 (PMH), 2023 WL 5935835, at *9 (S.D.N.Y. Sept. 12, 2023) (plaintiff had disability under NYSHRL based on an accident that impacted his ability his walking); Ugactz v. United Parcel Serv., Inc., No. 10 Civ. 1247 (MKB), 2013 WL 1232355, at *14 (E.D.N.Y. Mar. 26, 2013) (depression is a disability under NYSHRL) (collecting cases).  At the very least, at the pleading stage, Dr. Pardo has plausibly pleaded good faith protected activity, even if the conduct ultimately "was not in fact unlawful."  Kelly, 716 F.3d at 16.

Defendants are completely incorrect that because Dr. Pardo pleaded some administrative and managerial responsibilities that her support for her colleagues is not entitled to anti-retaliation protection.[13]  Such a rule—as proposed by Defendants—would strip all managerial employees of anti-retaliation protections for supporting others.  There is not a single case which stands for that broad proposition, let alone at the pleading stage.  As stated by the Second Circuit:

> To the extent an employee is required as part of her job duties to report or investigate other employees' complaints of discrimination, such reporting or investigating by itself is not a protected activity under § 704(a)'s opposition clause, because merely to convey others' complaints of discrimination is not to oppose practices made unlawful by Title VII. But if an employee—even one whose job responsibilities involve investigating complaints of discrimination—actively 'support[s]' other employees in asserting their Title VII rights or personally 'complain[s]' or is 'critical' about the 'discriminatory employment practices' of her employer, that employee has engaged in a protected activity under § 704(a)'s opposition clause.
>
> [Here, Plaintiff] alleges that she, 'in her capacity as Director of EEO [,] repeatedly objected and complained to defendants [] about defendants' selection process and failure to abide by proper anti-discrimination policies and procedures.' [] Littlejohn also alleges that she "objected to defendants Mattingly and Bakers' discriminatory policies during scheduled meetings with them" over the course of more than a year. [] Littlejohn argues on appeal that

---

13    In fact, the Amended Complaint largely describes Dr. Pardo's job responsibilities as setting up the Emergency Room practice and some administrative and managerial responsibility around that effort.  Nothing in the Amended Complaint even states that she was responsible for handling or reporting anti-discrimination issues.  See Dk. No. 10 at ¶¶ 36-41 (describing Dr. Pardo's role at ASC).

> she stepped outside her role as EEO Director when she advocated for minority DJJ employees, but regardless of whether she made these complaints in her capacity as EEO Director, '§ 704(a)'s opposition clause protects' such 'complaints to management' and 'protest[s] against discrimination.' Littlejohn was not simply conveying others' complaints of discrimination to Mattingly and Baker or alerting them to Title VII's mandates; she was complaining about what she believed was unlawful discrimination in the personnel decision-making process during the ACS/DJJ merger. Her complaints of discrimination were protected activities under § 704(a)'s opposition clause.

Littlejohn, 795 F.3d at 318 (reversing dismissal of complaint) (internal citations omitted).

Consistent with Littlejohn, case law merely holds that where an employee is strictly acting within their capacity to report or investigate claims, such actions may not constitute protected activity; however, this nearly always requires a fact-specific inquiry and can only be decided on summary judgment. All Defendants' cited cases were summary judgment or post-trial decisions. See Sarkis v. Ollie's Bargain Outlet, No. 10 Civ. 6382 (CJS), 2013 WL 1289411, at *13 (W.D.N.Y. Mar. 26, 2013), aff'd, 560 F. App'x 27 (2d Cir. 2014) (summary judgment); Ezuma v. City Univ. of N.Y., 665 F. Supp. 2d 116 (E.D.N.Y. 2009), aff'd, 367 F. App'x 178 (2d Cir. 2010) (summary judgment); Correa v. Mana Prod., Inc., 550 F. Supp. 2d 319, 331 (E.D.N.Y. 2008) (granting summary judgment where, "[p]laintiff admits that her investigation of complaints and the resolution of those complaints was actually part of her job description"); McKenzie v. Renberg's Inc., 94 F.3d 1478, 1483 (10th Cir. 1996) (appeal from a trial verdict).

As mentioned, Dr. Pardo's retaliation claims are also predicated on conduct she engaged in to protect herself from pregnancy discrimination. Protected activity covers requests for pregnancy-related accommodations and complaints about the lack of such provisions. See e.g. Tang v. Glocap Search LLC, No. 14 Civ. 1108 (JMF), 2015 WL 5472929, at *2 (S.D.N.Y. Sept. 16, 2015) ("There is no dispute that an employee's complaint about pregnancy discrimination—

whether formal or informal—can constitute protected activity."); <u>Gratton v. Jetblue Airways</u>, No. 04 Civ. 7561 (DLC), 2005 WL 1251786, at *10 (S.D.N.Y. May 25, 2005) (rejecting argument that "requests for accommodation of one's pregnancy do not constitute protected activity"); <u>Malena v. Victoria's Secret Direct, LLC</u>, 886 F. Supp. 2d 349, 363 (S.D.N.Y. 2012) (describing protected activity in a NYSHRL case involving a pregnant woman to include complaints, otherwise manifesting opposition to discrimination, and even merely "voicing concerns").

To that end, in her Amended Complaint, Dr. Pardo alleges that after she informed Dr. Infernuso about her pregnancy, he responded by harassing her with increasing work demands and increased hours. <u>See</u> Dkt. No. 19 at ¶¶ 107-13. Dr. Pardo alleges that she told Dr. Infernuso that the newly proposed hours would not be possible given her pregnancy and simultaneously reached out to her doctor for an accommodation note. <u>Id.</u> at ¶ 114. Dr. Pardo alleges that she also reported her concerns to Human Resources (Mr. Welsh) and told him that the hours being demanded were not feasible given her existing workload and her need for pregnancy accommodations. <u>Id.</u> at ¶ 116. For pleading purposes, Dr. Pardo plausibly alleged that she opposed Dr. Infernuso's harassing demands and sought pregnancy-related accommodations, both of which constitute protected activity.

Finally, as stated, because Defendants addressed the incorrect allegations, disregarding the issues at hand, Defendants' cited cases—most of which are also summary judgment decisions—are inapposite. <u>See</u> <u>e.g.</u> <u>Forrest v. Jewish Guild for the Blind</u>, 3 N.Y.3D 295, 313 (2004) (granting summary judgment because retaliation claim predicated on non-discriminatory, "generalized harassment"); <u>Patterson v. City of New York</u>, No. 158598/2020 (DDR), 2021 WL 5445502 at *2 (N.Y. Cnty Nov. 9, 2021) (dismissing complaint where no inference could be drawn that any protected category implicated by complaints); <u>Vo v. Goodwill Indus. of Bronx</u>

<u>Site</u>, No. 04 Civ. 5039 (MHD), 2009 WL 5179136 at *10 (S.D.N.Y. Dec. 29, 2009) (granting summary judgment on retaliation claim where "[t]he problem for plaintiff is that the actions he undertook that he cites as having triggered his termination did not, by his own description, relate to such prohibited discrimination").

**IV.     <u>Defendants Are Not Entitled to a Stay Due to a Partial Motion to Dismiss</u>**

Defendants seek a stay of discovery despite already litigating the issue before Magistrate Judge Tiscione, and the application was denied. <u>See</u> Dkt. Nos. 14, 15 and Dkt. Txt dated Feb. 21, 2024. Nonetheless, Defendants cannot establish any of the elements of entitlement to a discretionary stay of discovery.

Under the Fed. R. Civ. P., a stay of discovery is not automatic upon the filing of a motion to dismiss. <u>See</u> <u>In re Currency Conversion Fee Antitrust Litig.</u>, No. M21-95, 2002 WL 88278, at *1 (S.D.N.Y. Jan. 22, 2002) ("a stay is not appropriate simply on the basis that a motion to dismiss has been filed."); <u>O'Sullivan v. Deutsche Bank AG</u>, No. 17 Civ. 8709 (LTS) (GWG), 2018 WL 1989585, at *3 (S.D.N.Y. Apr. 26, 2018) ("discovery should not be routinely stayed simply on the basis that a motion to dismiss has been filed."). The burden rests on the moving party to establish entitlement to a stay pending a motion to dismiss. <u>See</u> <u>Mirra v. Jordan</u>, No. 15 Civ. 4100 (AT) (KNF), 2016 WL 889559, at *2 (S.D.N.Y. Mar. 1, 2016).

As Defendants note, the primary factors for consideration of a stay include (1) whether the defendant has made a "strong showing" that the plaintiff's claim is unmeritorious, (2) the breadth and burden of discovery, and (3) prejudice to the opposing party. <u>Kanowitz v. Broadridge Fin. Inc.</u>, No. 13 Civ. 649 (DRH) (AKT), 2014 WL 133870, at *6 (E.D.N.Y. Mar. 31, 2014). Not a single one of these factors can be met by Defendants.

Critically, Defendants have made absolutely no showing—let alone a "strong showing"—that there is any likelihood of success on their proposed partial motion to dismiss. Defendants' motion ignores numerous allegations in the Amended Complaint, disregards the arguments Plaintiff previously explained were the basis for her claims, completely miscites the law and judicial authority and simply lacks any legitimate basis. Moreover, the case law cited by Defendants all involves motions for *full* dismissal not *partial* dismissal as here.[14] See O'Sullivan, 2018 WL 1989585, at *3 (stay granted in highly complex matter upon filing of full motion to dismiss); Thomas v. New York City Dep't of Educ., No. 09 Civ. 5167 (SLT), 2010 WL 3709923, at *1 (E.D.N.Y. Sept. 14, 2010) (full motion to dismiss); Barnes v. Cnty. of Monroe, No. 10 Civ. 6164 (JWF), 2013 WL 5298574, at *1 (W.D.N.Y. Sept. 19, 2013) (full motion to dismiss); New York v. Grand River Enterprises Six Nations, Ltd., No. 14 Civ. 910 (AF), 2015 WL 686819, at *2 (W.D.N.Y. Feb. 18, 2015) (full motion to dismiss).

While that alone should dictate a denial of Defendants' stay application, Defendants have also presented no undue burden. A party requesting a stay must state "any burden associated with the production[,]" and "vague and conclusory contentions are not sufficient" to prevail. Mirra, 2016 WL 889559, at *2; RBG Mgmt. Corp. v. Village Super Market, Inc., No. 22 Civ. 7996 (JLR), 2023 WL 1996920, at *2 (S.D.N.Y. Jan. 24, 2023) (same).

Defendants have categorically failed to show why allowing discovery would be so overly burdensome so as to justify a stay when their motion to dismiss is utterly futile. Defendants merely point to Plaintiff identifying 45 individuals in her initial disclosures and fact that there has "already [been] motion practice" over these witnesses. See Defs.' Br, at p. 19. But

---

[14]    As mentioned above, Judge Tiscione rejected Defendants' stay application based on the fact that they were only even seeking partial dismissal. See supra at p. 4; see also Ex. A.

24

Defendants' discovery motion was a burden of their own making.[15] Judge Tiscione roundly rejected Defendants' motion at oral argument. Now, the parties are proceeding with discovery as in the normal course of any litigation—the parties have already exchanged responses and objections to formal discovery requests and met and conferred regarding alleged deficiencies. See Gottlieb Decl. at ¶ 11. In fact, Plaintiff—an individual—has produced far more documents than even Defendants—a corporation with many employees—at this stage. Id. To the extent the parties are unable to work through their disputes on the scope of appropriate discovery, those disputes can be addressed by Magistrate Judge Tiscione and Defendants can present whatever arguments they believe to be appropriate as to burden and breadth. As such, Defendants' claimed burden at this stage is non-existent, speculative and completely unestablished.

Plaintiff will suffer the prejudice if delay in her case results from Defendants' partial motion to dismiss. Dr. Pardo was terminated more than one year ago, and memories of witnesses may fade and the risk of document destruction always exists. Moreover, Defendants have already exhibited a lack of candor in the discovery process. Notably, Defendants failed to identify in their initial disclosures or interrogatory responses the name of an individual with whom Dr. Infernuso communicated about Dr. Pardo's request not to work grueling hours after she announced her pregnancy. . Plaintiff only learned about this individual through document review, and even then, Defendants refused to disclose his contact information—Plaintiff had to locate it through counsel's due diligence. See Gottlieb Decl. at ¶ 12. As such, Defendants' lack of candor and attempt to interfere with the discovery process imposes a heightened importance for Plaintiff to advance this matter through discovery forthwith.

---

[15] Defendants filed a completely frivolous pre-motion letter attempting to curtail Plaintiff and her counsel's very basic First Amendment Rights (and counsel's rights and obligations under the Rules of Professional Conduct) to be able to communicate with members of the public about her claims. See Dkt. Nos. 24, 25, 27 and 28.

25

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Defendants' Partial Motion to Dismiss and Stay Discovery be denied in its entirety.

Dated: June 12, 2024
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
David E. Gottlieb
Meredith A. Firetog
Brooke Payton (admission pending)

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
dgottlieb@wigdorlaw.com
mfiretog@wigdorlaw.com
bpayton@wigdorlaw.com

*Counsel for Plaintiff*